**ESPRIT DE CORP, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 91–05–00406.**

United States Court of
International Trade.

March 26, 1993.

Bellsey and Baker (Steven W. Baker) San Francisco, CA, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Joseph I. Liebman, Atty. in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, New York City (Susan Burnett Mansfield), Washington, DC, Sheryl A. French, Atty., U.S. Customs Service, New York City, of counsel, for defendant.

### OPINION

RESTANI, Judge:

This matter is before the court on cross-motions for summary judgment. Plaintiff,

Esprit de Corp ("Esprit"), asserts that the United States Customs Service ("Customs") improperly appraised footwear imported from the People's Republic of China. Esprit contends that the differential between air and sea freight charges, reimbursed by the manufacturer after the date of importation, should have been deducted from the transaction value before assessment of duties. The government argues that Customs properly excluded the differential reimbursement pursuant to 19 U.S.C. § 1401a(b)(4)(B) (1988) which directs it to disregard, in determining transaction value, any rebate or other decrease in price that is made or effected after the date of importation into the United States.

## FACTS

Esprit, a corporation based in San Francisco, California, contracted through its agent, San Francisco Shoeworks, for the purchase of a number of styles of shoes from Yeswin Industries, Ltd. ("Yeswin"), Hong Kong. The shoes were manufactured in China and Yeswin was to ship by sea from Hong Kong to the United States. The purchase orders and letters of credit provided for purchases on F.O.B. Hong Kong terms, with Esprit responsible for costs of shipping and insurance to the United States. The purchase orders and letters of credit specified final dates for shipment of the shoes from the factories in China to Yeswin in Hong Kong and from Hong Kong to Esprit in the United States.

Before the initial shipping dates, Yeswin advised Esprit's agent that it would be unable to meet shipping date requirements. In order for Esprit to meet delivery commitments to its customers, air shipment was necessary. Before the merchandise was shipped to the United States, Esprit, through its agent, reached an agreement with Yeswin that the shipment would be by air, with arrival dates later than the sea shipment arrival dates. Esprit would make payment according to the terms of the purchase orders and letters of credit. Yeswin agreed to reimburse Esprit the amount of the cost differential between sea and air shipment.

The shoes were shipped after the original shipping dates. Esprit paid for the merchandise by letter of credit at the original F.O.B. Hong Kong prices, as well as the cost of air freight. Yeswin reimbursed Esprit by wire transfer based on Esprit's reconciliation of costs at the end of the shipping season. The calculation reflected the actual freight charges of independent air freight carriers and the filed tariffs of sea carriers. Customs appraised the merchandise at the invoiced unit values, refusing to appraise at the invoiced unit values less an amount equal to the freight differential reimbursement. Protests, timely filed against the liquidations of the merchandise, were denied. This action was timely filed after the protests were denied and all liquidated duties paid.

## DISCUSSION

The statute very clearly details the appropriate procedures and components in appraising merchandise for assessment of customs duties. According to 19 U.S.C. § 1401a(b)(1), "[t]he transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States." Further, 19 U.S.C. § 1401a(b)(4) states:

(A) The term "price actually paid or payable" means the total payment (whether direct or indirect, and *exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States* ) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller.

(B) Any rebate of, or other decrease in, the price actually paid or payable that is made or otherwise effected between the buyer and seller *after the date of the importation* of the merchandise into the United States *shall be disregarded in determining the transaction value under paragraph (1).*

19 U.S.C. § 1401a(b)(4) (1988) (emphasis added).

The government argues that the statute mandates that the freight differential reim-

bursement be disregarded by Customs in appraising the merchandise because: (1) costs associated with international shipment are not part of the transaction value; and (2) the amounts were paid by Yeswin to Esprit after the dates of importation. The government relies on the recent decision in *Allied Int'l v. United States*, — CIT ——, 795 F.Supp. 449 (1992). In that case, this court found the language of § 1401a(b)(4)(B) to be unambiguous and held that, despite the preimportation agreement to award a price bonus if certain conditions were met, the importer was required to show that the stipulated conditions were satisfied and payment was made prior to the date of entry. 795 F.Supp. at 451, 453. Therefore, the court determined that Customs had properly disregarded the preimportation agreement in calculating transaction value. *Id.*, 795 F.Supp. at 450.

Esprit claims that because its letter of credit states that a late shipment would be subject to cancellation, payment of the freight differential was a renegotiation of the original contract. It is Esprit's primary contention that the agreement negotiated by its agent with Yeswin, prior to shipment to the United States, was, effectively, a price discount and the methodology used to calculate the discount was the freight differential. Esprit attempts to distinguish *Allied* by claiming that case involved a conditional bonus, whereas here there was no contingency and the amount of the discount "payable" was fixed by a formula.

In support of its claim, Esprit has submitted affidavits from the Esprit agent who negotiated with Yeswin, Esprit's managers of freight payables and merchandise, and Yeswin's sales manager. The thrust of the evidence, however, is simply to confirm that Yeswin reimbursed Esprit for the additional cost of air freight, an issue not in dispute. Most notably, Yeswin's sales manager acknowledges that he agreed to pay for the additional cost of air freight to "honor" the company's commitment and avoid cancellation of the orders, but makes no reference at all to the fact that assumption of the additional expense was, in fact, a price discount.

Esprit also claims that there was no change in the parties' obligation for payment of international freight charges since Esprit arranged and paid for the international transportation. Therefore, the reimbursement is a reduction in price and must be deducted from the invoice value.

It is quite clear that neither Yeswin nor Esprit wanted to cancel the orders and that Esprit was willing to accept delivery at a somewhat later date if it was not adversely affected by doing so. There are many ways to negotiate a contract for late shipments, and one way is to have the party responsible for the delay bear the burden of any additional cost incurred as a result. Yeswin was willing to bear the burden of the delay by agreeing to pay the additional cost of air freight. Esprit cannot argue successfully that, because it arranged and initially paid for the air freight, it continued to bear the full cost of transportation and that any rebate reduces the invoice price of the merchandise. There is no evidence that international shipping costs were part of the price paid or payable for the merchandise. Rather, the evidence submitted by Esprit clearly shows that the intent of the reimbursement was to have both Esprit and Yeswin bear a portion of the transportation cost.

Esprit also compares the effect of late shipment to shortages and damaged or defective merchandise, which have been recognized as acceptable bases for post-entry price reductions. Esprit argues that late shipment, particularly of fashion merchandise such as footwear, can dramatically affect the value of goods just as defects, damage or shortages would. It is Esprit's position that, in late shipments, the merchandise value is affected by the cost of the air freight and the price payable established prior to exportation is the proper transaction value regardless of when reimbursement was made. Esprit states that Customs, in Customs Service Decisions (C.S.D.) 83–62, has recognized that late shipment discounts reduce transaction value when the new prices were agreed upon and payment completed before exportation of the goods, and there is no reason why one arrangement should be treated differently from the other, where both are the result of

an agreement between the parties establishing the method for calculating final prices.

Esprit's argument that late shipments, like shortages, defects or damages, affect the value of merchandise is without merit in this context. In situations of shortages, defects or damages, the buyer receives less than what it contracted for and, therefore, any reduction in value is verifiable and a proportionate reduction in price would be appropriate. Esprit, on the other hand, received the merchandise ordered. Whether late shipments sometimes affect the value of merchandise is irrelevant, because Esprit has failed to substantiate any loss in value incurred as a result of the shipping delay, let alone a loss equal to the amount of the differential in freight cost.

Reliance on C.S.D. 83–62 is also misplaced. In that case, the invoice price for the goods was to be reduced in an amount equal to the excess in freight costs, prior to shipment. Here, Esprit paid the original contract price for the goods and received reimbursement of the excess freight costs after the date of importation. The parties have control over the structure of their transaction. Here, they did not structure it to avoid the limitation of 19 U.S.C. § 1401a(b)(4).

The evidence in this case does not support a finding that shipping was part of, or that price reductions were made to, the price actually paid or payable. Since 19 U.S.C. § 1401a(b)(4)(A) explicitly excludes transportation costs from the price calculation and 19 U.S.C. § 1401a(b)(4)(B) disregards any rebate after the date of importation, the transactional value of the merchandise remained unchanged, and Customs properly appraised the merchandise at the invoiced unit prices. Therefore, the plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted.